Filed 7/22/13  In re Nicole H. CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re NICOLE H. et al., Persons Coming Under the Juvenile Court Law. | B244748<br><br>(Los Angeles County<br>Super. Ct. No. CK82834) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>AMY H.,<br><br>        Defendant and Appellant. | |

        APPEAL from orders of the Superior Court of Los Angeles County, Elizabeth Kim, Juvenile Court Referee.  Affirmed in part and reversed in part.

        Andrea R. St. Julian, under appointment by the Court of Appeal, for Defendant and Appellant.

        John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Aileen Wong, Deputy County Counsel, for Plaintiff and Respondent.

_____

Amy H. appeals from orders of the juvenile court summarily denying her petitions under Welfare and Institutions Code section 388[1] and the termination of her parental rights under section 366.26. She also contends the record does not demonstrate compliance with the Indian Child Welfare Act, title 25 United States Code section 1900 et seq. (ICWA). We affirm with the exception of the court's compliance with ICWA, which requires a limited remand for further proceedings.

### FACTUAL AND PROCEDURAL BACKGROUND

Amy is the mother of six children, two of whom were removed from her custody when she was incarcerated in the State of Texas and four of whom, including Nicole and Alberto (the subjects of this appeal), have been removed upon petition by the Los Angeles County Department of Children and Family Services (Department). Nicole, then aged 9, and Alberto, eight months, were detained by the Department, along with their 11-year-old brother, Damian H., on June 23, 2010 after a neighbor reported the older children had been physically and emotionally abused.

The Department's initial investigation revealed the older children had multiple bruises on their face, limbs and torso. Amy acknowledged the bruises "looked bad" but said Nicole bruised easily and had been roughhousing with her uncle, who had been visiting the family. Damian claimed most of his multiple bruises and scratches resulted from playing sports but admitted one bruise on his thigh was caused by Amy whipping him with a belt. Alberto did not appear to have any physical injuries. During a tour of the children's bedroom, the investigating social worker observed marijuana lying on the dresser. Amy acknowledged she smoked marijuana. She insisted she had a medical marijuana card but was unable to locate it. The Department detained the children. Forensic examinations of the children the next day yielded findings of suspected nonaccidental injury and physical abuse of Damian and Nicole.

Relatives advised the Department Amy had been diagnosed with bipolar disorder and had been incarcerated in Texas for possession of marijuana, assault and drug

---

[1] Statutory references are to the Welfare and Institutions Code unless otherwise specified.

2

trafficking.  Amy confirmed she had a criminal record in Texas and had spent time in prison.  She also admitted two of her children had been placed in foster care in Texas and one of the two had been adopted.  Until her death the previous year Amy's mother had been the legal guardian of Damian and Nicole.

The Department filed a dependency petition on behalf of the children alleging multiple counts of  physical abuse of the older children (§ 300, subd. (a)), failure to protect all three as a result of mental illness and drug abuse (§ 300, subd. (b)) and abuse of siblings (§ 300, subd. (j)).  At the detention hearing the court found a prima facie case for detaining the children and ordered them placed in foster care.  Amy was allowed monitored visitation.

Amy informed the Department she had Cherokee or Blackfoot ancestry through her great-great-grandfather, whom she believed had been an enrolled member of a tribe, and executed the form entitled "Parental Notification of Indian Status" (ICWA-020).  On July 8, 2010 the Department submitted notices to the Cherokee and Blackfoot tribes with the information provided by Amy.  The notices, however, along with the responses from the tribes, are missing from the record.

The jurisdiction/disposition report disclosed the extent of Amy's criminal history in Texas:  A November 1991 arrest and conviction for interfering with the duties of a public servant; a March 2000 arrest and conviction for abandonment of a child with the intent to return; a March 2001 federal arrest and guilty plea for possession with intent to distribute marijuana; a September 2001 federal arrest and conviction for importing marijuana; a January 2003 arrest and conviction for criminal mischief, assault of a public servant and resisting arrest; an August 2003 federal arrest and conviction for importing marijuana; a May 2006 arrest and conviction for assaulting a public servant; separate March 2007 arrests and convictions for assaulting a public servant and criminal mischief; and a September 2007 arrest and conviction for assault of a public servant.  Amy was released from prison in 2009.[2]

---

[2]     Many of the assault charges arose during her extended time in prison.

3

The Department also reported Amy had been diagnosed with oppositional defiance disorder when she was a child and had been placed in foster care when she was nine years old because her family could not control her. She was later diagnosed with bipolar disorder and borderline personality disorder while incarcerated in federal prison.[3] Nicole and two other children were born when she was incarcerated. According to relatives, Amy had never formed a real relationship with the children, who were in the custody of her mother.

Based on these facts the Department recommended Amy not be provided with family reunification services. At the July 20, 2010 jurisdiction hearing the juvenile court sustained the allegations in the petition (as amended) and declared the children dependents of the court under section 300, subdivisions (a), (b) and (j). Notwithstanding the Department's recommendation no services be provided, the court ordered Amy be provided with reunification services. As part of the court-ordered disposition plan, she agreed to submit to a psychological examination and to enroll in drug and alcohol rehabilitation programs with random testing, parent education class and individual and conjoint counseling with the children (if appropriate). Visitation remained monitored.

In September 2010 Amy was arrested and incarcerated for check forgery. She was released in December 2010 and entered a sober living home. On January 10, 2011 a service provider reported she had completed nine of 20 parenting and anger management classes, 10 of 20 domestic violence classes and 12 of 20 substance abuse classes. Amy's visits with the children, when she was not incarcerated, had gone well. Meanwhile, the children had been placed together in a foster home and were thriving. At the January 18, 2011 six-month review hearing, the court found Amy was in compliance with the case plan and ordered services to continue.

In March 2011 Amy stopped visiting the children. The Department subsequently learned she had left the sober home and had disappeared to avoid being reincarcerated for

---

[3] Amy claimed she was unable to take psychotropic medication due to adverse side effects and instead smoked marijuana to self-medicate.

4

parole violations. In the report prepared for the 12-month review hearing, the Department recommended reunification services be terminated and the matter set for a section 366.26 hearing. In addition to one of Amy's sisters, the foster mother, with whom the children had bonded, indicated she would be interested in adopting them. Shortly before the scheduled hearing Amy contacted the Department and acknowledged she understood these recommendations and asked if the children could be adopted together. She refused to disclose her location. On July 27, 2011 the juvenile court found Amy was not in compliance with the case plan and terminated reunification services.

On August 23, 2011 Amy was arrested and reincarcerated. She had resumed visits with the children in July 2011, but the visits were disrupted by her arrest. Although the Department reported the visits had been appropriate, Alberto did not appear to be attached to his mother and cried for his caregiver. Damian and Nicole treated Amy as a friend rather than a mother figure. Amy was able to maintain sporadic telephone contact with the children during her incarceration. On October 28, 2011, while still in jail, Amy gave birth to her sixth child, Alexis H., who was also removed from her custody.

The Department ultimately identified Damian, Nicole and Alberto's foster mother as their prospective adoptive parent. The children indicated they wanted to remain with her. At Damian's July 25, 2012 section 366.26 hearing, however, he objected to being adopted. The foster mother was appointed as Damian's legal guardian. From July through August 2012 Amy had no contact with the children. After her release from custody on August 23, 2012, she resumed monitored visits.

On September 6, 2012 Amy filed a section 388 petition requesting the court reinstate reunification services and vacate the hearing on the scheduled section 366.26 hearing for Nicole and Alberto. As evidence of the required showing of changed circumstances, Amy alleged she had been released from custody and had enrolled in a drug treatment program, domestic violence classes, anger management classes and individual counseling. The court summarily denied the petition on September 10, 2012.

On September 27, 2012 Amy filed another section 388 petition seeking resumption of her reunification services. Attached to the petition were letters attesting she had attended two group meetings of an alcohol and drug program and eight sessions of parenting education/anger management classes.

The section 366.26 hearing for Nicole and Alberto was held on October 1, 2012. After argument by counsel, the court summarily denied Amy's section 388 petition and proceeded with the hearing for the selection and implementation of a permanent plan. Amy testified she had visited with the children three times since her release and had spoken with them regularly throughout her incarceration about their schooling and other activities. Following her testimony the court ruled Amy had not carried her burden of establishing the parent-child exception under section 366.26, subdivision (c)(1)(B)(i), terminated her parental rights and transferred care, custody and control of Nicole and Alberto to the Department for the purpose of adoption planning and placement.

## DISCUSSION

1. *The Juvenile Court Properly Denied the Section 388 Petitions Without a Hearing*

Section 388 provides for modification of prior juvenile court orders when the moving party can demonstrate new evidence or a change of circumstances and modification of the previous order is in the child's best interest. (*In re Aaliyah R.* (2006) 136 Cal.App.4th 437, 446; *In re Kimberly F.* (1997) 56 Cal.App.4th 519, 526.) "The parent seeking modification must 'make a prima facie showing to trigger the right to proceed by way of a full hearing.'" (*In re Anthony W.* (2001) 87 Cal.App.4th 246, 250.) The required prima facie showing has two elements: The parent must demonstrate (1) a genuine, significant and substantial change of circumstances or new evidence and (2) revoking the previous order would be in the best interests of the child. (*Id.* at p. 250.) That is, "the petition must allege a change of circumstance or new evidence that requires changing the existing order." (*In re Daijah T.* (2000) 83 Cal.App.4th 666, 672.) "It is not enough for a parent to show *just* a genuine change of circumstances under the statute.

6

The parent must show that the undoing of the prior order would be in the best interests of the child." (*In re Kimberly F.,* at p. 529.)

"The petition [is] liberally construed in favor of its sufficiency." (*In re Daijah T., supra,* 83 Cal.App.4th at p. 672.) To be entitled to a hearing, the petitioner "need[] only . . . show 'probable cause'; [the petitioner is] not required to establish a probability of prevailing on [the] petition." (*In re Aljamie D.* (2000) 84 Cal.App.4th 424, 432-433.) Nonetheless, if the allegations fail to show changed circumstances such that the child's best interests will be promoted by the proposed change of order, the dependency court need not order a hearing. (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 806-807 ["the hearing is only to be held if it appears that the best interests of the child may be promoted by the proposed change of order"]; see *In re Edward H.* (1996) 43 Cal.App.4th 584, 593 ["'prima facie' showing refers to those facts which will sustain a favorable decision if the evidence submitted in support of the allegations by the petitioner is credited"].)

We review the juvenile court's summary denial of a section 388 petition for abuse of discretion. (*In re Angel B.* (2002) 97 Cal.App.4th 454, 460; *In re Anthony W., supra,* 87 Cal.App.4th at p. 250.) The appellate court will not disturb the juvenile court's decision unless the juvenile court has exceeded the limits of legal discretion by making an arbitrary, capricious or patently absurd determination. (*In re Angel B.,* at p. 460.)

The juvenile court did not abuse its discretion in summarily denying Amy's section 388 petitions, which were filed on the eve of the termination of her parental rights more than two years after the detention of the children and more than one year after the termination of her family reunification services. During that time Amy failed to complete her court-ordered programs and apparently never sought the psychiatric treatment she desperately needed. While it is true she was incarcerated for a lengthy period, that cannot excuse her failure to take the steps necessary to reunify with her children.

Amy's contention she was only required to make a prima facie showing to obtain a hearing on her petition does not alter our conclusion. The mere fact she has re-enrolled in classes ordered two years earlier is at best prima facie evidence of *changing* circumstances: "A petition which alleges merely changing circumstances and would

7

mean delaying the selection of a permanent home for a child to see if a parent, who has repeatedly failed to reunify with the child, might be able to reunify at some future point, does not promote stability for the child or the child's best interests." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 47; see *ibid.* ["'"[c]hildhood does not wait for the parent to become adequate"'"].)

We also reject Amy's apparent suggestion the court must accept her allegations of the children's best interests as sufficient on their face and is thus barred from considering the existing record in deciding whether a hearing is warranted. A petition under section 388 requires a comparison between the allegations of the petition and the record to date, including prior factual findings of the court and the evidence supporting those findings. (See, e.g., *In re Angel B., supra,* 97 Cal.App.4th at p. 461 ["[w]hether [m]other made a prima facie showing entitling her to a hearing depends on the facts alleged in her petition, as well as the facts established as without dispute by the court's own file"], 463 [appellate court reviewing summary denial of § 388 petition properly considers facts adduced in prior proceedings—"with which the juvenile court was thoroughly familiar"—to determine whether petitioner successfully demonstrated changed circumstances].) Amy had every opportunity to contest those findings at the time they were made. Her meager allegations of changed circumstances that *might* promote the best interests of her children were wholly inadequate. Accordingly, the juvenile court did not abuse its discretion in summarily denying the petitions.

2. *Amy Did Not Establish Her Entitlement to the Parent-child Exception*

Section 366.26 directs the juvenile court in selecting and implementing a permanent placement plan for a dependent child. The express purpose of a section 366.26 hearing is "to provide stable, permanent homes" for dependent children. (§ 366.26, subd. (b).) Once the court has decided to end parent-child reunification services, the legislative preference is for adoption. (§ 366.26, subd. (b)(1); *In re Celine R.* (2003) 31 Cal.4th 45, 53 ["[i]f the child is adoptable . . . adoption is the norm. Indeed, the court must order adoption and its necessary consequence, termination of parental rights, unless one of the specified circumstances provides a compelling reason for finding that termination of parental rights

8

would be detrimental to the child."]; see *In re Marilyn H.* (1993) 5 Cal.4th 295, 307 [once reunification efforts have been found unsuccessful, the state has a "compelling" interest in "providing stable, permanent homes for children who have been removed from parental custody" and the court then must "concentrate its efforts . . . on the child's placement and well-being, rather than on a parent's challenge to a custody order"].)  When the court finds by clear and convincing evidence the child is likely to be adopted, the statute mandates judicial termination of parental rights unless the parent opposing termination can demonstrate one of six enumerated exceptions applies.  (§ 366.26, subd. (c)(1)(B); see *In re Matthew C.* (1993) 6 Cal.4th 386, 392 [when child adoptable and declining to apply one of the statutory exceptions would not cause detriment to the child, the decision to terminate parental rights is relatively automatic].)

To satisfy the subdivision (c)(1)(B)(i) exception to termination, the exception invoked by Amy, a parent must prove he or she has "maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i); see *In re Derek W.* (1999) 73 Cal.App.4th 823, 826 ["parent has the burden to show that the statutory exception applies"].)  The "benefit" prong of the exception requires the parent to prove his or her relationship with the child "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents."  (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 ["the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer"].)  No matter how loving and frequent the contact, and notwithstanding the existence of an "emotional bond" with the child, "the parents must show that they occupy 'a parental role' in the child's life."  (*In re Andrea R.* (1999) 75 Cal.App.4th 1093, 1108; see *In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1418.)  The relationship that gives rise to this exception to the statutory preference for adoption "characteristically aris[es] from day-to-day interaction, companionship and shared experiences.  Day-to-day contact is not necessarily required, although it is typical in a parent-child relationship."  (*In re Casey D., supra,* 70 Cal.App.4th at p. 51.)  Moreover,

9

"[b]ecause a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350.)

The juvenile court's findings that the parent-child relationship exception is inapplicable here is fully supported by the record. (See *In re K.P.* (2012) 203 Cal.App.4th 614, 621-622 [finding whether beneficial parental relationship exists reviewed for substantial evidence; determination whether existence of that relationship constitutes compelling reason not to terminate parental rights reviewed for abuse of discretion]; *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314-1315 [same].) Other than Damian's emotional conflict over his own adoption, there is nothing in this record that suggests Amy's relationship with Nicole and Alberto was parental in nature or that retention of her parental rights would be in their best interests. Nicole and Alberto had clearly bonded with their foster mother, and Nicole consistently stated she wanted to remain with the foster mother and be adopted by her.[4] Amy has failed to offer any evidence the children would benefit more from a continued relationship with her than from the stability and permanence offered by their prospective adoption. In fact, the record shows Nicole and Alberto lived with Amy for less than a year between the time she was released from prison in Texas (Nicole was born while Amy was incarcerated) until they were detained by the Department. Amy never assumed a parental role; to the contrary, she regularly abused them during that short year. To be sure, it is difficult for any parent to assume a parental role in the context of incarceration and monitored visitation, but Amy alone is responsible for those conditions. Her children, who thrived with their foster mother, should not bear

---

[4]     There is a poignant letter dated September 21, 2012 from 11-year-old Nicole to the court attesting to her feelings: "I want to say I love my mom but I know she can not get her life together an[d] I am doing good where I am[.] [My foster mother] takes care of me good . . . and b[uys] us the things we need. I want to stay with her an[d] be adopted . . . I just want this over no more court."

10

the burden of Amy's failure to address the issues that led to the juvenile court's assumption of jurisdiction.

        3.   *The Department's Failure To Preserve the ICWA Notices Requires a Limited Remand To Ensure Compliance with ICWA*

The purpose of ICWA is to "'protect the best interests of Indian children and to promote the stability and security of Indian tribes and families.'" (*In re Karla C.* (2003) 113 Cal.App.4th 166, 173-174, quoting 25 U.S.C. § 1902; see also *In re Suzanna L.* (2002) 104 Cal.App.4th 223, 229; *In re Santos Y.* (2001) 92 Cal.App.4th 1274, 1299.) "ICWA presumes it is in the best interests of the child to retain tribal ties and cultural heritage and in the interest of the tribe to preserve its future generations, a most important resource." (*In re Desiree F.* (2000) 83 Cal.App.4th 460, 469.) For purposes of ICWA, an "Indian child" is a child who is either a member of an Indian tribe or is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe. (25 U.S.C. § 1903(4).)

ICWA provides, "In any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved, the party seeking foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and the Indian child's tribe" of the pending proceedings and its right to intervene. (25 U.S.C. § 1912(a); see *In re S.B.* (2005) 130 Cal.App.4th 1148, 1157.) Similarly, California law requires notice to the Indian custodian and the Indian child's tribe in accordance with section 224.2, subdivision (a)(5), if the Department or court knows or has reason to know that an Indian child is involved in the proceedings. (§ 224.3, subd. (d).) The circumstances that may provide reason to know the child is an Indian child include, without limitation, when a member of the child's extended family provides information suggesting the child is a member of a tribe or one or more of the child's parents, grandparents or great-grandparents are or were a member of a tribe. (§ 224.3, subd. (b)(1).)

Juvenile courts and child protective agencies have "'an affirmative and continuing duty'" to inquire whether a dependent child is or may be an Indian child. (*In re H.B.*

11

(2008) 161 Cal.App.4th 115, 121; § 224.3; Cal. Rules of Court, rule 5.481.) As soon as practicable, the social worker is required to interview the child's parents, extended family members, the Indian custodian, if any, and any other person who can reasonably be expected to have information concerning the child's membership status or eligibility. (§ 224.3, subd. (c); *In re Shane G.* (2008) 166 Cal.App.4th 1532, 1539; Cal. Rules of Court, rule 5.481(a)(4).)

The record shows that, in response to Amy's assertion of Indian heritage, the Department mailed notices to the Cherokee and Blackfoot tribes. The notices, however, are missing, as are any responses from the tribes. The Department concedes these circumstances require a limited remand to fulfill the duty of inquiry required by ICWA and California law. Accordingly, we conditionally reverse the orders made at the section 366.26 hearing to allow the Department to document its compliance with ICWA.

## DISPOSITION

The orders summarily denying Amy's section 388 petitions are affirmed. The order terminating Amy's parental rights to and placing Nicole and Alberto for adoption is conditionally reversed and a limited remand is ordered as follows. Upon remand, the court shall direct the Department to make further inquiries regarding the children's Indian ancestry pursuant to section 224.1 and send ICWA notices to the relevant tribes in accordance with the ICWA and California law. The Department shall thereafter file certified mail, return receipts, for the ICWA notices, together with any responses received. If no responses are received, the Department shall so inform the

12

court.  The court shall determine whether the ICWA notices and the duty of inquiry requirements have been satisfied and whether the children are Indian.  If the court finds the children are not Indian, it shall reinstate the order terminating parental rights and placing the children for adoption.  If the court finds the children to be Indian, it shall vacate its order terminating parental rights and placing the children for adoption and conduct further proceedings in compliance with the ICWA and related California law.


                                                    PERLUSS, P. J.


    We concur:



            WOODS, J.



            ZELON, J.